United States District Court
Northern District of California

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11
12

ANTHONY BERNARD SMITH, JR.,

13

Plaintiff,

14

v.

15

JIMMY CRUZEN, et al.,

16

Defendants.

17

Case No. 14-CV-04791 LHK (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 64, 80

18     Plaintiff Anthony Bernard Smith, a California state prisoner proceeding *pro se*, filed an

19 amended civil rights complaint under 42 U.S.C. § 1983.  On February 21, 2017, defendants filed a

20 motion for summary judgment.  Plaintiff has filed an opposition,[1] and defendants have filed a

21 reply.  For the reasons stated below, defendants' motion is granted.

22                                         **BACKGROUND**

23     The following facts are taken in the light most favorable to plaintiff.

24     At the time of the challenged events, plaintiff was a practicing Muslim housed in the West

25 Block at San Quentin State Prison ("SQSP").  Dkt. No. 13 ("Am. Compl.") ¶ 10.  According to

26

27 ─────────────────
[1] Plaintiff's motion for leave to file an opposition in excess of 25 pages is granted.  Dkt. No. 80.

28

plaintiff's Islamic religious beliefs, plaintiff is required to pray five times a day at specified times, and plaintiff believes that he receives 27 times more blessings during congregational prayer than during individual prayer. *Id.* ¶¶ 11-12. Plaintiff believes that a Muslim is obligated to participate in congregational prayer whenever feasible. *Id.* ¶ 23. SQSP had a rule that prohibited the SQSP Muslim prisoners from offering congregational prayer in groups of more than four prisoners at a time. *Id.* ¶ 13.

On September 22, 2013, a non-defendant correctional sergeant prohibited Muslim prisoners from offering congregational prayer of more than four prisoners, even though a group of approximately 25 Christian prisoners were offering congregational prayer without interruption. *Id.* ¶ 14. Plaintiff and other prisoners filed a group inmate grievance, challenging this rule that prohibited congregational prayer of more than four prisoners at one time. *Id.* ¶ 15 and Ex. A. On May 14, 2014, SQSP's Religious Review Committee ("RRC") met to discuss the issues raised in the group grievance. *Id.* ¶ 17. As a result, the RRC decided to permit Muslim prisoners to participate in congregational prayer of no more than 15 prisoners at a time. *Id.* On May 15, 2014, a memorandum was drafted memorializing the discussions in the meeting. *Id.*, Ex. A at 28-30. On June 3, 2014, Associate Warden S.R. Albritton issued a religious accommodations modification order specifically stating that the following accommodations were authorized: (1) faith prayer will be allowed to occur in West Block during the evening activity program, approximately at sunset; (2) no more than 15 individuals would be allowed to participate in the sessions; and (3) prayer would last no longer than 6 to 8 minutes. *Id.*, Ex. A at 26. The modification order also stated, "management staff, as discussed with the appellant of this request, reserves the discretion to make adjustments to these accommodations as safety and security dictates." *Id.*

On June 28, 2014, the first day of Ramadan, Muslim prisoners started offering evening congregational prayer. Am. Compl. ¶ 18. They continued these evening congregational prayers without any interruptions until July 25, 2014. *Id.* at ¶¶ 18-19. On July 25, 2014, defendants

Correctional Sergeant Jimmy Cruzen, Correctional Officer C. Caldera, Correctional Officer R. Christensen, and Correctional Officer David Ogle interrupted the prayer and surrounded the Muslim prisoners who were praying.[2] *Id.* ¶¶ 19-20. Cruzen directed the Muslim prisoners to stop praying. *Id.* ¶ 19.

Muslim prisoner Saif'ullah asked Cruzen what the problem was, and informed Cruzen that Muslim prisoners had been given permission to perform congregational prayer. *Id.* ¶ 20. Cruzen informed the Muslim prisoners that they were "grouping up," and were not allowed to be in a group of more than four inmates at a time. *Id.* Saif'ullah told Cruzen that the Muslim prisoners were granted permission to engage in congregational prayer, and Cruzen replied that the grievance was granted but then denied. *Id.* Saif'ullah addressed Ogle, stating, "Ogle you know about the memorandum, you seen it." *Id.* Ogle replied that he had seen the memorandum but had never read it. *Id.* Cruzen was provided with copies of the May 15, 2014 memorandum and the June 3, 2014 modification order authorizing congregational prayer of up to 15 Muslim prisoners, but Cruzen remarked that the modification order was not signed, and continued to direct the Muslim prisoners to disperse. *Id.* ¶¶ 20-21. Defendants placed their hands on their batons in a threatening manner as Cruzen instructed the Muslim prisoners to "get out of here." *Id.* ¶ 21. Plaintiff asserts that there is a small window of time within which to perform the evening congregational prayer. *Id.* ¶ 24. Defendants caused plaintiff to miss the congregational evening prayer on July 25, 2014. *Id.* Plaintiff returned to his cell to "make up" the missed prayer. Pl. Decl. ¶ 17.

Plaintiff alleges that defendants violated the First Amendment Free Exercise Clause, First Amendment Establishment Clause, First Amendment right against retaliation, Fourteenth Amendment right to equal protection, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

---

[2] In plaintiff's administrative grievance, plaintiff stated that defendants interrupted the Muslim prisoners' evening congregational prayer around 7:35 p.m. Am. Compl. Ex. B at 41. However, in plaintiff's opposition, plaintiff asserts that "7:35 p.m." was a typographical error, and instead, plaintiff meant "8:35 p.m." Opp. at 19-20.

**ANALYSIS**

I.    Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over material facts, and "factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby, Inc.*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.*  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with

evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## II.   Evidence considered

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of defendants' motion for summary judgment, defendants have properly submitted declarations and supporting exhibits.

Plaintiff has filed an amended complaint, and an opposition with supporting exhibits, including his declaration. A complaint may be used as an opposing affidavit under Rule 56, if it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, plaintiff's amended complaint and declaration were filed in conformity with 28 U.S.C. § 1746. However, plaintiff's opposition was not verified or acknowledged to be true or correct under penalty of perjury. Therefore, the court may consider plaintiff's amended complaint, declaration, and supporting exhibits as evidence, but plaintiff's opposition cannot be used as an opposing affidavit.

## III.   Free Exercise

Plaintiff alleges that defendants' actions on July 25, 2014 violated his First Amendment right to the free exercise of his religion. Defendants argue that the impact on plaintiff's right to the free exercise of his religion did not result in a substantial burden. Even if it did, argue defendants, their actions were reasonably related to legitimate penological interests. And, finally, in the alternative, defendants argue that they are entitled to qualified immunity. The court addresses each argument in turn.

A.    Substantial burden

In order to establish a free exercise violation, a prisoner must show that a defendant substantially burdened the practice of his religion without any justification reasonably related to legitimate penological interests.  *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008); *see, e.g.*, *Bolds v. Cavazos*, No. 14-15176, 599 Fed. Appx. 307 (9th Cir. March 20, 2015) (unpublished memorandum disposition) (dismissing Free Exercise Clause claim because inmate failed to show that confiscation of television "substantially burdened" the practice of religion).  "A substantial burden . . . place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Jones v. Williams*, 791 F.3d 1023, 1031-32 (9th Cir. 2015).

The evidence is undisputed that defendants interrupted and stopped plaintiff from completing one evening congregational prayer session on July 25, 2014.  Plaintiff alleges for the first time in his declaration attached to the opposition that the following night, on July 26, 2014, plaintiff did not participate in evening congregational prayer out of fear that he would be subjected to violence, humiliation or disciplinary action.  Pl. Decl. ¶ 18.  These newly presented facts are untimely.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("[A] new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under this second theory of liability.") (citations omitted).  The court's obligation to read the pleadings liberally in *pro se* cases extends to facts actually contained in the pleadings and does not grant a *pro se* plaintiff free rein to raise new facts and theories in his opposition.

Although the court must construe pleadings liberally, "[p]ro se litigants must follow the same rules of procedure that govern other litigants," *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, 925 (9th Cir. 2012), which in this case means requiring plaintiff to properly plead factual allegations.  *See*

*Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to advance new theories "presented for the first time in [the plaintiff's] opposition to summary judgment"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal quotations omitted); *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082 (E.D. Cal. 2010) ("[A] plaintiff cannot oppose summary judgment based on a new theory of liability because it would essentially blind side the defendant with a new legal issue after the bulk of discovery has likely been completed.").

In this case, the allegation that defendants' July 25, 2014 actions resulted in plaintiff's decision not to engage in evening congregational prayer the following night out of fear that plaintiff would be subject to violence, humiliation, or disciplinary action appeared for the first time in plaintiff's opposition to summary judgment. Not only did plaintiff fail to plead these facts in his amended complaint, but the court finds that the evidence does not show that plaintiff's decision not to engage in congregational evening prayer on July 26, 2014 was caused by defendants. Thus, the court will not consider plaintiff's new allegations that defendants prevented plaintiff from evening congregational prayer on July 26, 2014.

Plaintiff has submitted evidence that he sincerely believes that as a Muslim, he is obligated to pray in congregation as often as possible, and that praying in congregation results in 27 times more blessings than praying alone. Pl. Decl. ¶ 4. Plaintiff concedes that prior to defendants' actions on July 25, 2014, Muslim prisoners had engaged in congregational evening prayer every day for 26 consecutive days without incident. *Id.* ¶ 10. If a Muslim misses a prayer, he must repent and atone for missing the prayer and make up for the missed prayer to fulfill his obligation. Hossain Decl. ¶ 5. On July 25, 2014, plaintiff returned to his cell to make up for the missed prayer. Pl. Decl. ¶ 17. On July 27, 2014, plaintiff and other Muslim prisoners continued their evening congregational prayers. *Id.* ¶ 18.

The court finds that there is an absence of evidence that defendants' actions on July 25,

Case No. 14-CV-04791 LHK (PR)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

7

2014 was a "substantial burden" on plaintiff's free exercise of religion such that it coerced plaintiff to forego his religious beliefs, or engage in conduct that violated those beliefs. *See id.*; *see, e.g.*, *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998) (affirming summary judgment on claim that defendant violated Free Exercise Clause by interrupting inmate's prayer time no more than 18 times over the course of 2 months because it was "relatively short-term and sporadic," and not a "substantial burden"); *Howard v. Skolnik*, Case No. 09-15382, 2010 WL 1253458, **1 (9th Cir. March 30, 2010) (unpublished memorandum disposition) (affirming summary judgment on "First Amendment claim concerning two alleged incidents where prison personnel interfered with prisoner's fasting because there was no genuine issue as to whether a substantial burden was placed on Howard's free exercise of religion"); *Chaparro v. Ducart*, Case No. 14-CV-4955 LHK, 2016 WL 491635, at *5 (N.D. Cal. Feb. 9, 2016) (granting defendants' motion for summary judgment because four missed chapel services did not amount to a substantial burden on plaintiff's right to the free exercise of religion), *aff'd by* Case No. 16-15693 (9th Cir. Aug. 9, 2017) (unpublished memorandum disposition).

Accordingly, defendants are entitled to summary judgment because there is no genuine issue of material fact that the one-time prohibition of engaging in evening congregational prayer was not a substantial burden on plaintiff's free exercise of religion.

B.     Reasonably related to legitimate penological interests

Alternatively, even if defendants' actions on July 25, 2014, substantially burdened plaintiff's free exercise of religion, defendants are still entitled to summary judgment because there is no genuine issue of material fact that their actions were reasonably related to legitimate penological interests at SQSP. A prison regulation that impinges on an inmate's First Amendment rights is valid if it is reasonably related to legitimate penological interests. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Allegations of a denial of an opportunity to practice religion "must be found reasonable in light of four factors: (1) whether there is a 'valid, rational connection' between the regulation and a legitimate government interest put forward to justify it; (2) 'whether there are alternative means of

exercising the right that remain open to prison inmates'; (3) whether accommodation of the asserted constitutional right would have a significant impact on guards and other inmates; and (4) whether ready alternatives are absent (bearing on the reasonableness of the regulation)." *Pierce v. County of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008) (citing *Turner*, 482 U.S. at 89-90); *see Beard v. Banks*, 548 U.S. 521, 532-33 (2006) (noting that application of the *Turner* factors does not turn on balancing the factors, but on determining whether the defendants show a reasonable relation, as opposed to merely a logical relation).

### 1.  Valid, rational connection

First, defendants assert that there was a valid, rational connection between Cruzen's order for the Muslim prisoners to disperse, and a legitimate governmental interest.  Legitimate penological interests include "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Procunier v. Martinez*, 416 U.S. 396, 412 (1974) (footnote omitted), *limited by Thornburgh v. Abbott*, 490 U.S. 401 (1989).  In determining whether there is a valid, rational connection to legitimate penological interests, the initial burden is on defendants to put forth a "common sense" or intuitive connection between their policy and a legitimate penological interest.  *See Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999).  When an inmate does not present enough evidence to refute this common sense connection between the prison regulation and the objective, the court is to presume the governmental objective is legitimate and neutral and *Turner*'s first prong is satisfied.  *See Ashker v. California Dept. of Corrections*, 350 F.3d 917, 923-24 (9th Cir. 2003); *Frost*, 197 F.3d at 357.  On the other hand, when an inmate presents evidence that refutes a common sense connection between a legitimate objective and the prison regulation, the state then must present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." *Ashker*, 350 F.3d at 923; *Frost*, 197 F.3d at 357.

Cruzen stated that on July 25, 2014, Cruzen heard a loud noise on the first tier, and went to investigate it.  Cruzen Decl. ¶ 3.  Cruzen noticed 12-15 inmates grouped together, and asked the other defendants to assist Cruzen in breaking up the group.  *Id.* ¶ 4.  Cruzen believed the group

needed to disperse because they were being disruptive, blocked traffic flow and accessibility to showers and tables on the first tier, and appeared to be "posting security." *Id.* ¶ 8. "Posting security" refers to a situation when prisoners are standing nearby and keeping watch, which is not permitted for security reasons because "posting security" usually indicates ongoing criminal activity. *Id.*

Cruzen's explanation is legitimate and passes the "common sense" standard. *See Frost*, 197 F.3d at 357. The logical connection between Cruzen's action and the stated policy reason is not so remote as to render it arbitrary or irrational. *See Turner*, 482 U.S. at 89-90. In sum, defendants have shown that a "common sense" connection between their actions in stopping the July 25, 2014 evening congregational prayer and their stated legitimate penological interests was reasonable. *See Frost*, 197 F.3d at 355 ("[A]s long as it is plausible that prison officials believed the policy would further a legitimate objective, the governmental defendant should prevail on *Turner*'s first prong.").

In response, plaintiff argues that defendants have not provided any evidence that praying in a large group posed any threat to institutional safety and security. Opp. at 10. Plaintiff also argues that on July 25, 2014 during evening congregational prayer, Muslim prisoners were not blocking the traffic flow nor being disruptive. Opp. at 10-11. Defendants point out that although plaintiff disputes that the Muslim prisoners were "posting security," plaintiff admits that defendants might have observed and been referring to a second group of 15 additional Muslim prisoners who were standing by, waiting with their prayer rugs so that they could offer congregational prayer when the first group concluded. Opp. at 11-12. However, because plaintiff's opposition is not verified, these statements are not admissible evidence.

At this juncture, defendants are not required to "make an evidentiary showing concerning the connection." *Frost*, 197 F.3d at 357. Only when a plaintiff presents sufficient evidence that refutes the "common sense" connection are defendants required to provide "enough counter-evidence to show that the connection is not so 'remote as to render the policy arbitrary or irrational.'" *Id.* (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999)).

Here, plaintiff's argument that defendants failed to prove that prohibiting large group prayer in fact promoted the safety and security of prison officials, or maintained order and discipline does not refute the "common sense" connection. *See Mauro*, 188 F.3d at 1060 (stating that defendants' initial burden of showing a "common sense" connection need only demonstrate that "defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests"). In addition, plaintiff concedes that defendants' regular policy of prohibiting prisoners from "posting security" was expressly forbidden in the June 3, 2014 accommodation order, and that "posting security" would have been cause for terminating the evening congregational prayer. Pl. Decl. ¶ 10.

Having found that plaintiff has not produced sufficient evidence to refute defendants' stated "common sense" connection, the court finds that defendants have satisfied the first *Turner* factor.

### 2. Alternative Means

Under the second *Turner* factor – the availability of alternatives – "[t]he relevant inquiry . . . is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the court must] determine whether the inmates have been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987)). "Also relevant to the evaluation of the second factor is a distinction *O'Lone* had no occasion to make: the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his [or her] soul." *Ward*, 1 F.3d at 878; *compare id.* (concluding that where prison officials have deprived an Orthodox Jewish prisoner of a kosher diet, a rabbi, and religious services, the second *Turner* factor weighs in the prisoner's favor), *with id.* at 880 (concluding that a prisoner's request not to be transported on the Sabbath was not reasonable under second *Turner* factor because prisoner had many opportunities to observe the Sabbath).

Defendants argue that plaintiff had alternative means of engaging in religious expression.

Despite the parties' disagreement as to when defendants instructed the Muslim prisoner group to disperse, the evidence is undisputed that the window for evening prayer that day concluded at 9:32 p.m. Hossain Decl. ¶ 4. There is no evidence that plaintiff was prevented from engaging in congregational prayer in a smaller group. Nor does plaintiff dispute that he could not pray individually in his cell prior to 9:32 p.m. In fact, plaintiff implies that on July 25, 2014, he did return to his cell to pray individually to make up the evening prayer. Pl. Decl. ¶ 17. In addition, defendants provide evidence that on July 25, 2014, Muslim Chaplain Hossain sponsored a special Ramadan Program at the chapel from 5:30 p.m. to 8:30 p.m. to which all inmates were invited to participate. Hossain Decl. ¶ 3. Plaintiff regularly attended prayer services at the Muslim chapel before and after July 25, 2014. *Id.* ¶ 6.

Thus, there are no genuine issues in dispute regarding whether plaintiff had an alternative means of religious expression, nor is there any evidence which shows plaintiff was "denied all means of religious expression." *Ward*, 1 F.3d at 877; *see also O'Lone*, 482 U.S. at 352 (holding that the second *Turner* factor is satisfied if a prison allows prayer and discussion, access to an imam, and observance of Ramadan, even if inmates could not attend a weekly religious service). In addition, there is no evidence in the record to suggest that plaintiff's failure to engage in one evening congregational prayer is "forbidden" by Islam, or that engaging in evening congregational prayer is a religious commandment. *See Ward*, 1 F.3d at 878. Plaintiff merely states that he receives more blessings in congregational prayer than in individual prayer and that he is obligated to pray in congregation as often as feasible. However, there is no evidence that congregational prayer is a requirement, or that the failure to do so is forbidden. *See id.* ("It is one thing to curtail various ways of expressing belief, for which alternative ways of expressing belief may be found. It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion."). Thus, the second *Turner* factor weighs in favor of defendants.

### 3. Impact on Others

"A third consideration [to determine whether a challenged policy is reasonable] is the

impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S.at 90. "When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Here, however, defendants are silent on any assessment regarding the impact that an accommodation would have on the prison. *See Shakur v. Schiro*, 514 F.3d 878, 887 (9th Cir. 2008) (noting that in order to prevail on the third *Turner* factor, the prison should provide evidence that the prison actually looked into or studied the effects that an accommodation would have on operating expenses). Thus, this third *Turner* factor does not support a reasonable relation between the defendants' curtailment of the July 25, 2014 evening congregational prayer and legitimate penological interests.

### 4. Presence of ready alternatives

Under the fourth and final *Turner* factor, whether the regulation is an "exaggerated response" to the prison's concerns, the prisoner must show there are "obvious, easy alternatives" to the regulation that "fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Turner*, 482 U.S. at 90-91. The burden is on the plaintiff to show that there are obvious and easy alternatives to the challenged policy. *See Mauro*, 188 F.3d at 1061; *Turner*, 482 U.S. at 90-91 ("if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."). "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 91. Instead, the proper inquiry is "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." *Overton v. Bazzetta*, 539 U.S. 126, 135-36 (2003).

Plaintiff suggests that the obvious, easy alternative was to allow the Muslim prisoners to

complete their evening congregational prayer on July 25, 2014 until after defendants could confirm that the large group prayer was authorized. Opp. at 14. The undisputed evidence shows that defendants instructed plaintiff and the other Muslim prisoners to disperse because prison security concerns prevented large group gatherings, and it appeared that the Muslim prisoners were "posting security." It is not reasonable then for defendants to permit the large group gathering or what appeared to be "posting security" to continue, especially when there is no evidence that defendants knew how long they would continue to gather. Plaintiff has not shown or argued that such an alternative involved de minimis costs to valid penological interests. Thus, the fourth *Turner* factor weighs in favor of defendants.

In addition, the test of whether the defendants' actions were reasonably related to a legitimate penological interest does not require "balancing these [*Turner*] factors, but rather determining whether [defendants show] more than simply a logical relation, that is, whether [they show] a reasonable relation." *Beard*, 548 U.S. at 533. Considering the *Turner* factors here, the court concludes that defendants' curtailment of the July 25, 2014 evening congregational prayer was reasonably related to legitimate penological interests.

Plaintiff has not provided sufficient evidence to show that defendants' act of requiring Muslim prisoners to disperse from the July 25, 2014 evening congregation prayer was unreasonable. Because plaintiff has failed to provide sufficient evidence of a First Amendment violation for a reasonable jury to return a verdict in his favor, defendants' motion for summary judgment is granted.

C.    Qualified immunity

Defendants also argue that they are entitled to qualified immunity. The defense of qualified immunity protects "government officials...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Regarding the first prong, the threshold question must be, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* at 202. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.*

Here, the law was clearly established that a prison regulation that impinges on an inmate's First Amendment rights is valid if it is reasonably related to legitimate penological interests. *See O'Lone v. Estate of Shabazz*, 482 U.S. at 349. "[A] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (citations omitted). "[I]f officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Moreover, the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). To do so, a court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the total factual circumstances surrounding the alleged violation. *See Watkins v. City of Oakland, California*, 145 F.3d 1087, 1092-93 (9th Cir. 1998). Such specificity does not mean qualified immunity exists "unless the very action in question has previously been held unlawful," but does require that "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

With these principles in mind, the constitutional question to be addressed here is not the general proposition espoused in *O'Lone*, but a more narrow one: whether a Muslim prisoner's

right to free exercise is denied when he is prohibited one time from engaging in evening congregational prayer. *See, e.g.*, *May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997) (recognizing *O'Lone* as establishing that prisoners retained protections of the free exercise clause, but defining the right as whether the prison's hair search procedure violated prisoners' right to free exercise of religion).

The plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct. *See Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992). Here, plaintiff merely cites to U.S. Supreme Court cases that stand for general propositions, and one district court case from Indiana in which the court held a bench trial and found that a federal prison's total ban on congregational prayer violated the Religious Freedom Restoration Act.[3]

The court has conducted a search for cases discussing whether prison officials violate the Free Exercise Clause when they prohibit inmates from engaging in one evening congregational prayer, and found no applicable United States Supreme Court or Ninth Circuit cases. *See Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). In the absence of binding precedent, the court may look to all available decisional law, including the law of other circuits and district courts. *See id.*; *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (only in absence of decisional authority by the U.S. Supreme Court or Ninth Circuit are other sources of decisional law, such as out-of-circuit cases, considered). Though there are a handful of out-of-circuit cases that have found total bans of congregational prayers to be unconstitutional, the court has not uncovered any cases that have found a temporary or sporadic deprivation to be unconstitutional. *See, e.g.*, *Williams v. Bragg*, No. EP-11-CV-475-PRM, 2012 WL 12878177, at *6-*7 (W.D. Tex. Aug. 31, 2012) (granting summary judgment to defendants and concluding that two isolated incidents, which generally do not support a First Amendment claim, of cancelling Al-Jumu'ah

---

[3] The U.S. Supreme Court struck down the Religious Freedom Restoration Act as inapplicable to state and local governments in *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997).

congregational prayer did not violate plaintiff's free exercise claim), *aff'd by* No. 12-50965, 537 Fed. Appx. 468 (5th Cir. July 29, 2013) (unpublished memorandum disposition); *Williams v. Jabe*, No. 7:08cv00061, 2008 WL 5427766, at *3 (W.D. Va. Dec. 31, 2008) (granting summary judgment to defendants and concluding that denying Muslim prisoners congregational prayer after Ramadan evening meals did not violate plaintiff's right to free exercise), *aff'd by* No. 09-6099, 339 Fed. Appx. 317 (4th Cir. July 29, 2009) (unpublished memorandum disposition); *Muhammad v. Klotz*, 36 F. Supp. 2d 240, 245 (E.D. Pa. Jan. 28, 1999) (granting summary judgment to defendants and concluding that denying Muslim prisoners the ability to engage in all congregational prayers except one daily evening congregational prayer did not violate plaintiff's right to free exercise).

Based on the lack of clear case law establishing that the Free Exercise Clause prohibits prison officials from stopping one evening congregational prayer, the court concludes that plaintiff's First Amendment right was not clearly established here.

In addition, whether a reasonable official could have believed the action taken was lawful is a mixed question of law and fact: "It involves an objective test of whether a reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took." *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995). Here, the record shows that defendants observed a large group of prisoners who looked like they were "posting security," which is prohibited as a security concern. Because the law was not clearly established, and the evidence is undisputed that defendants believed the large group of prisoners gathering was a security concern, a reasonable officer could have believed that defendants' actions were lawful.

In sum, because plaintiff's right to free exercise was not clearly established in this situation, the court concludes that a reasonable official in defendants' positions would not have believed that prohibiting plaintiff in one instance of engaging in evening congregational prayer would be unlawful.

Defendants' motion for summary judgment on plaintiff's free exercise of religion claim is

GRANTED.

IV.    Establishment Clause

Plaintiff alleges that defendants' actions on July 25, 2014 violated the Establishment Clause.  Defendants argue that plaintiff has not alleged facts to support an Establishment Clause claim.

The U.S. Supreme Court has interpreted the Establishment Clause to mean that the government may not promote or affiliate itself with any religious doctrine or organization and may not discriminate among persons on the basis of their religious beliefs and practices.  *See County of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).  For the purpose of an Establishment Clause violation, a state policy need not be formal, written or approved by an official body to qualify as state sponsorship of religion; however, the actions complained of must be sufficiently imbued with the state's authority to constitute state endorsement of religion.  *See Canell v. Lightner*, 143 F.3d 1210, 1214-15 (9th Cir. 1998) (correctional officer's evangelizing activities did not constitute state endorsement of religion because activities were not sanctioned in any way by policy of correctional facility or staff and were short-term and sporadic).  A state regulation or practice "does not violate the Establishment Clause if (1) the enactment has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion."  *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 762 (9th Cir. 1981) (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)).

Plaintiff argues that the challenged state regulation or practice is defendants' "personal policy" of endorsing Christianity and disfavoring Islam.  Opp. at 21.  Plaintiff alleged that a group of approximately 25 Christian prisoners engaged in daily congregational prayer without interference from prison officials, even on July 25, 2014.  Opp. at 22.   Plaintiff argued that because Caldera, Christensen, and Ogle regularly patrol the West Block, it was physically impossible for defendants not to have witnessed a Christian prayer group because the "Christian

prayer group had been an on-going activity long before" July 25, 2014. Opp. at 22-23.

The Establishment Clause of the First Amendment "prohibits the enactment of a law or official policy that 'establishes a religion or religious faith, or tends to do so.'" *Newdow v. Lefevre*, 598 F.3d 638, 643 (9th Cir. 2010) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)). The clause applies to official condonement of a particular religion or religious belief, and to official disapproval or hostility towards religion. *American Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1120-21 (9th Cir. 2002) (quotation marks and citations omitted).

Here, plaintiff alleges that defendants had a "personal policy" disfavoring Muslims rather than acted pursuant to an official policy. While it is true that a government policy does not have to be "formal, written, or approved by an official body to qualify as state sponsorship of religion," case law is clear that there must be evidence that the State endorsed or ratified defendants' actions. *See Canell*, 143 F.3d at 1214. There is no evidence that the state endorsed or ratified defendants' actions. Rather, the evidence is undisputed that soon after defendants dispersed the evening congregational prayer, defendants were informed that the June 3, 2014 modification order permitted Muslim prisoners to engage in congregational prayer of up to 15 prisoners, and Muslim prisoners continued their evening congregational prayers again on July 27, 2014. This evidence leads to the inference that the State in fact did not endorse or ratify defendants' actions. There is also no evidence that defendants had the authority to create policy. *See id.* In fact, plaintiff does not suggest that defendants were acting pursuant to any official policy or custom of the facility.

In *Canell*, the Ninth Circuit affirmed a district court's grant of summary judgment of a prisoner's Establishment Clause claim when the prisoner alleged that over a two-month period, a correctional officer attempted to convert the prisoner to the Christian faith. *Id.* at 1211. The correctional officer engaged in religious debate with the inmates, performed mock preaching, sang Christian songs, and often brought the Bible to work and placed it in view of the inmates. *Id.* at 1211-12. The Ninth Circuit agreed with the district court's determination that because the correctional officer's actions "were sporadic, of short duration, and ceased when he no longer

supervised [plaintiff]," the correctional officer was entitled to summary judgment. *Id.* at 1212.

Similarly here, there is no evidence that defendants' actions were sanctioned by an official policy of the prison. Defendants' interaction with plaintiff occurred over a matter of minutes, as opposed to the correctional officer in *Canell*. Shortly after plaintiff complained about defendants' order to the Muslim prisoners to disperse, prison staff clarified for defendants that the June 3, 2014 accommodation order was valid, and Muslim prisoners continued their evening congregational praying on July 27, 2014. Under these circumstances, there is an absence of evidence that defendants' activities were "imbued with the state's authority to constitute state endorsement of religion." *Id.* at 1214.

Accordingly, defendants' motion for summary judgment is GRANTED as to plaintiff's Establishment Clause claim.

## V. Retaliation

Plaintiff claims that defendants' actions on July 25, 2014 amounted to retaliation against plaintiff. Specifically, plaintiff asserts that defendants took an adverse action against plaintiff when they ordered plaintiff to stop engaging in congregational prayer. Plaintiff claims that defendants did so because plaintiff was practicing Islam and exercising his constitutional right to free exercise of religion; that defendants' actions chilled plaintiff's rights; and defendants' actions did not reasonably advance a legitimate correctional goal.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). The court finds that plaintiff has not demonstrated a genuine issue of material fact as to whether defendants acted because of plaintiff's protected conduct, and as to whether defendants' actions reasonably advanced a legitimate correctional goal.

First, there is an absence of evidence that defendants took an adverse action "because" of plaintiff's protected conduct. The element of causation requires a showing that the prison official intended to take the adverse action out of "retaliatory animus" to "silence and to punish" the inmate, as opposed to for some other reason. *Shepard v. Quillen*, 840 F.3d 686, 689-91 (9th Cir. 2016). That is, plaintiff must "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [defendants'] intent" in requiring the Muslim prisoners to stop the evening congregational prayer. *Id.* at 689 (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009)); *see Hartman v. Moore*, 547 U.S. 250, 259 (2006) (explaining that a section 1983 plaintiff "must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action").

Evidence probative of retaliatory animus includes proximity in time between the protected conduct and the alleged adverse action, a prison official's expressed opposition to the speech, and that a prison official's proffered reason for the adverse action was false or pretextual. *See id.* at 690. On the other hand, mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citing cases) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit).

Here, plaintiff does not allege that the adverse action was taken because plaintiff was engaged in protected conduct, i.e. congregational prayer. This is fatal to plaintiff's retaliation claim. Rather, plaintiff appears to argue that defendants stopped the Muslim prisoners from their evening congregational prayer because plaintiff and the Muslim prisoners were granted the June 3, 2014 modification order. Plaintiff conceded that after the June 3, 2014 modification order issued, no one interrupted their evening congregational prayers for at least 26 consecutive nights.

Even if plaintiff has established temporal proximity, retaliation is not established simply by showing adverse activity by defendant after protected speech; rather, plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation

claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this"). In addition, there is no evidence that any defendant expressed opposition to plaintiff's protected activity, or that defendants' reasons for stopping the evening congregational prayer on July 25, 2014 were false or pretextual. That is, plaintiff has not provided any evidence outside of temporal proximity. This is insufficient to show a causal connection. *See, e.g.*, *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Friedman v. Kennard*, No. 07-4116, 2007 WL 2807861, at **4 (10th Cir. Sept. 25, 2007) ("Standing alone and without supporting factual allegations, temporal proximity between an alleged exercise of one's right of access to the courts and some form of jailhouse discipline does not constitute sufficient circumstantial proof of retaliatory motive to state a claim."). There is simply no evidence from which it can be inferred that that when defendants ordered the Muslim prisoners to disperse, defendants were motivated by a retaliatory animus because plaintiff was engaged in protected conduct.

Finally, as to the fifth factor, once a prisoner has pleaded the absence of legitimate correctional goals for the conduct of which he complains, the burden shifts to defendants to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995). In order to do this, courts should apply the four-factor test from *Turner v. Safley*, 482 U.S. 78 (1978), to determine whether the proferred legitimate penological interest is reasonably related to a regulation which infringes on a prisoner's constitutional rights even in a retaliation analysis. *See Brodheim v. Cry*, 584 F.3d 1262, 1272 (9th Cir. 2009).

Here, the evidence is undisputed that it appeared as if the Muslim prisoners were posting security, which is not permitted because of safety and security reasons. The evidence is also undisputed that when Cruzen ordered the Muslim prisoners to disperse, Cruzen informed the prisoners that he was interrupting them because the prisoners were "grouping up," and the rule

was that prisoner could not "be in a group of more than four inmates at a time." Am. Compl. ¶ 20. Because the court has already applied the *Turner* standard to plaintiff's free exercise claim, and determined that the curtailment of the July 25, 2014 evening congregational prayer was reasonably related to the prison's rule against "posting security," plaintiff cannot succeed on this fifth factor.

To the extent plaintiff intended to argue that defendants stopped the July 25, 2014 evening congregational prayer because plaintiff had filed the group appeal that resulted in the June 3, 2014 modification order, the court finds that the retaliation claim still cannot survive summary judgment. While plaintiff does have a constitutional right to file grievances, for the above reasons, there is still an absence of evidence as to causation and whether defendants' actions reasonably advanced legitimate correctional goals.

Alternatively, the court finds that defendants are entitled to qualified immunity on this claim as well. Even assuming that the law was clearly established that it was unlawful to retaliate against a prisoner for engaging in congregational prayer, a reasonable officer could believe that it was not unlawful to stop congregational prayer of at least 12-15 prisoners who posed a security concern because it looked as if they were "posting" security.

Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claim is granted.

V.    Equal Protection Clause

Plaintiff alleges that defendants intentionally discriminated against plaintiff by refusing to allow plaintiff a reasonable opportunity to pursue Islam as compared to the opportunities provided to prisoners not of Islam faith.

Prisoners are protected by the Equal Protection Clause from intentional discrimination on the basis of their religion. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *overruled in part by Shakur*, 514 F.3d at 884-85. To prevail on an equal protection claim under 42 U.S.C. § 1983, a plaintiff must plead and prove that "the defendants acted with an intent or purpose to discriminate against the plaintiff based on membership in a protected class." *Lee v. City of Los*

*Angeles,* 250 F.3d 668, 686 (9th Cir. 2001), *quoting Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

The "intent" component of the discrimination requires a showing "the defendant acted at least in part *because of* the plaintiff's protected status." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (emphasis in original). In determining whether a discriminatory intent or purpose exists, the court "may consider direct evidence of discrimination, statistical evidence showing a discriminatory impact, or other factors that could reveal a discriminatory purpose, like the historical background of the policy." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016).

Here, plaintiff alleges that, beginning on June 28, 2014, Muslim prisoners were permitted to engage in evening congregational prayer without interruption from defendants or other prison officials until July 25, 2014. While plaintiff asserted in his amended complaint that on September 22, 2013, a group of about 25 Christian prisoners were offering evening congregational prayer and were not interrupted, Am. Compl. ¶ 14, plaintiff does not provide evidence that defendants knew about the Christian prisoner groups. Plaintiff further states that the Christian prisoners were allowed to assemble in large groups for congregational worship every Saturday since 2012 "in the baseball dugout on the yard," as well as daily during the evening West Block in-house program. *Id.* ¶¶ 7-8. Defendants flatly dispute that they ever observed any other large grouping of prisoners praying prior to July 25, 2014. Plaintiff argues that it would be "physically impossible" for defendants never to have witnessed the "Christian prayer group" because Caldera, Christensen, and Ogle regularly walked around West Block to monitor prisoner activities. Pl. Decl. ¶ 9.

However, plaintiff has not come forward with evidence to raise a genuine issue of material fact that defendants' order to plaintiff and Muslim prisoners to disperse from their evening congregational prayer on July 25, 2014 was intentionally discriminatory, much less that such treatment was because of plaintiff's religion. Although plaintiff generally complains of differential treatment between Muslims and other faith groups, Ninth Circuit precedent states that

because an equal protection claim requires proof of intentional discrimination, "[m]ere indifference" to the unequal effects on a particular class does not establish discriminatory intent. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005). Plaintiff's conclusory allegations and mere assertions of discrimination against his religion are insufficient to overcome a motion for summary judgment. Fed. R. Civ. P. 56; *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). That is, plaintiff has "not . . . come forward with admissible evidence that, even viewed in the light most favorable to [him], demonstrates discriminatory intent." *Thornton*, 425 F.3d at 1167. Without more, no constitutional claim can prevail.

Defendants' motion for summary judgment on plaintiff's equal protection claim is granted.

VI.    <u>RLUIPA</u>

Plaintiff claims that defendants' actions violated the RLUIPA. Section 3 of RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 [which includes state prisons, state psychiatric hospitals, and local jails], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

Plaintiff seeks injunctive relief as well as monetary damages. However, as defendants point out, and plaintiff concedes, injunctive relief is moot because plaintiff has since been transferred to another institution. Accordingly, plaintiff's request for injunctive relief is DISMISSED as moot.

In addition, RLUIPA does not authorize suits against state actors, including prison officials, acting in their individual capacity. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (agreeing with other circuits addressing this issue). Claims may only be brought against such defendants in their official or governmental capacity. *Id.* However, the availability of money damages from state officials sued in their official capacity turns on whether the State has waived

United States District Court
Northern District of California

its Eleventh Amendment immunity from such suits, or congress has abrogated that immunity under its power to enforce the Fourteenth Amendment. *See Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1112 (9th Cir. 2010). The Ninth Circuit has held that California has not waived, and congress has not abrogated, state immunity with respect to monetary damage claims under RLUIPA. *Id.* at 1112-14. Consequently, RLUIPA does not authorize money damages against state officials, whether sued in their official or individual capacities. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015).

Accordingly, defendants' motion for summary judgment on plaintiff's RLUIPA is granted.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.[4] The clerk shall terminate all pending motions and close the file.

**IT IS SO ORDERED.**

Dated: 10/26/2017

LUCY H. KOH
United States District Judge

---

[4] Because the court grants defendants' motion for summary judgment on the merits, the court finds it unnecessary to address defendants' additional arguments regarding plaintiff's requests for damages based on emotional distress and for punitive damages.

Case No. 14-CV-04791 LHK (PR)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California